UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TIMOTHY J. BOHEN,

                              Plaintiff,

        v.                                              **DECISION AND ORDER**
                                                        04-CV-1039S

JOHN E. POTTER, Postmaster General, United
States Postal Service,

                              Defendant.


## I.  INTRODUCTION

        In this employment discrimination action, Plaintiff Timothy J. Bohen alleges that

Defendant  John  E.  Potter,  Postmaster  General,  United  States  Postal  Service,

discriminated against him in violation of the Rehabilitation Act of 1973, 29 U.S.C. §§ 791,

et seq., the Age Discrimination and Employment Act of 1967, 29 U.S.C. §§ 621, et seq.

("ADEA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title

VII").  (Compl. ¶ 1.)

        Presently before this Court is Defendant's Motion for Summary Judgment pursuant

to Rule 56(b) of the Federal Rules of Civil Procedure.[1]  (Docket No. 12).  Plaintiff opposes

the motion in part.[2]  For the reasons stated below, Defendant's motion is granted in part

---

        [1]In support of its Motion for Summary Judgment, Defendant filed the following documents: a
memorandum of law; a Local Rule 56 Statement of Material Facts Not In Dispute, with attached exhibits; a
reply memorandum of law; the Affidavit of Mary E. Roach, Esq., with attached exhibit; and a response to
Plaintiff's Local Rule 56 Statement of Material Facts Not In Dispute.

        [2]In opposition to Defendant's motion, Plaintiff filed a memorandum of law, a Local Rule 56
Statement of Material Facts Not In Dispute, with attached exhibits.  Plaintiff opposes Summary Judgment
as to the claims of disability discrimination, failure to accommodate, and constructive discharge.  Plaintiff
does not oppose Summary Judgment as to the claims of discrimination on the basis of race, color, sex

and denied in part.

## II. BACKGROUND

### A.    Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local Rule 56.1 statements of facts.[3]   Plaintiff Timothy Bohen is a Caucasian male, age 57.  (Pl.'s Statement, ¶ 1.[4])  Plaintiff was employed by the United States Postal Service for over thirty-five years.  (Pl.'s Statement, ¶ 2.)  For the last ten years of his employment, Plaintiff held the position of Post Office Operations Manager ("POOM") in Buffalo, New York, a high level management position.  (Pl.'s Statement, ¶ 2.)  And beginning in July 2003, Plaintiff reported to David Patterson, District Manager. (Pl.'s Statement, ¶ 4; Defendant's Statement, ¶ 53.)

Plaintiff has a number of medical issues.  In 1990, Plaintiff was diagnosed with Type 2 Diabetes Mellitus.  (Defendant's Statement, ¶ 10.[5])  Plaintiff also had been diagnosed with bilateral background retinopathy, nephropathy, chronic renal failure, neuropathy, bilateral Charcot's arthrotic changes, hypertension, myastenia graves, dyslipidemia, anxiety, depression and anemia. (Defendant's Statement, ¶¶ 10-11.)

---

and age.

[3]This Court will deem uncontroverted factual assertions admitted to the extent they are supported by the record evidence.  See Local Rule 56.1(c) (statements of undisputed fact that are not controverted by the non-moving party are deemed admitted).

[4]Referring to Plaintiff's Local Rule 56.1 Statement of Material Facts Not In Dispute, which contains citations to the record evidence.  (Docket No. 18.)

[5]Referring to Defendant's Local Rule 56.1 Statement of Material Facts Not In Dispute, which contains citations to the record evidence.  (Docket No. 14.)

In 1999, Plaintiff came under the care of Joseph Gerbasi, M.D., in order to treat Plaintiff's "large diabetic left foot ulcer." (Defendant's Statement, ¶¶ 12-13.) In November 1999, Plaintiff underwent an amputation of his left fifth toe. (Plaintiff's Statement, ¶ 8.) Plaintiff's post-operative course was difficult, but the wound eventually healed, although not completely. (Defendant's Statement, ¶ 13.) In February of 2000, Plaintiff was able to perform his regular functions as a postal worker. (Letter from Dr. Gerbasi to Karen Milazzo, March 10, 2004, Docket No. 15, Ex. G.)

Plaintiff's medical progress continued until January 23, 2003, when he developed "dry gangrene and extensive abscess of the forefoot of his left foot, with severe involvement of the first and second toes." (Defendant's Statement, ¶ 14.) On February 28, 2003, Plaintiff underwent a "modified transmetatarsal amputation of the left foot." (Plaintiff's Statement, ¶ 9.) As a result of the surgery, Dr. Gerbasi determined that Plaintiff was unable to work between February 28 and June 8, 2003. (Defendant's Statement, ¶ 16.)

On June 5, 2003, Plaintiff told Dr. Gerbasi that he wanted to return to work 4 hours a day. (Defendant's Statement, ¶ 17.) Believing that Plaintiff had sufficiently recovered, Dr. Gerbasi permitted his return to work and imposed several restrictions. (Defendant's Statement, ¶ 19.) Dr. Gerbasi listed the restrictions on a disability certificate form that is used by his office and is designed to make employers or educational institutions aware of the medical condition of the patient. (Defendant's Statement, ¶ 18.) The restrictions included limiting Plaintiff's workday to four to five hours in the office, minimal walking, and elevating the foot as much as possible. (Plaintiff's Statement, ¶ 15.) Dr. Gerbasi also prescribed a "shoe" for Plaintiff. (Plaintiff's Statement, ¶ 16.) The shoe is designed for

3

amputees and has a Velcro binding to accommodate dressings.  (Plaintiff's Statement, ¶ 16.)  Dr. Gerbasi also signed Plaintiff's application for a handicap tag to place in his vehicle.  (Plaintiff's Statement, ¶ 22.)

On June 9, 2003, Plaintiff returned to work, reporting to then District Manager, Nick Fabozzi.  (Plaintiff's Statement, ¶ 24.)  Upon his return, Plaintiff used a handicapped parking space, entered through a different, handicapped-accessible entrance, and wore a blue surgical shoe on his left foot.  (Plaintiff's Statement, ¶¶ 21 & 23.)

In July 2003, David Patterson replaced Nick Fabozzi as the District Manger.  (Plaintiff's Statement, ¶ 27.)  Patterson issued a statement of personal expectations to Plaintiff and the others he managed.  (Defendant's Statement, ¶ 54.)  The personal expectations statement indicated that anyone, who needed to work less than eight hours per day and directly reports to Patterson, must personally notify Patterson of the need.  (Defendant's Statement, ¶ 55.)  Sometime in July 2003, Plaintiff met with Patterson and discussed his physical restrictions and his 4-5 hour workday.  (Defendant's Statement, ¶ 57; Plaintiff's Statement, ¶ 29.)  Patterson indicated that he had no need for a part-time POOM.  (Plaintiff's Statement, ¶ 29.)  Thereafter, Plaintiff began working full time.  (Plaintiff's Statement, ¶ 30; Defendant's Statement, ¶ 58.)

After Plaintiff began working full time, Patterson asked Plaintiff if he had any plans to retire.  (Plaintiff's Statement, ¶ 31.)  Additionally, Robert Rutkowsky, the Acting Manager of Human Resources, had three conversations with Plaintiff, wherein he advised Plaintiff to bring in a slip from his physician clearing him to work without limitations.  (Plaintiff's Statement, ¶ 36.)  In response, Plaintiff told Rutkowsky that he did not understand the

reason to bring a slip in because he resumed full time work.  (Plaintiff's Statement, ¶ 37.) Rutkowsky explained that Patterson continued to ask him about Plaintiff's medical documentation.  (Plaintiff's Statement, ¶ 38.)

In August 2003, Plaintiff saw Dr. Gerbasi for a follow up visit.  (Plaintiff's Statement, ¶ 40.)  Plaintiff told Dr. Gerbasi that he wanted to return to work full time and felt that he could do his job "from the desk, on the phone, the computer."  (Bohen Dep. 74:11-14.) Plaintiff told Dr. Gerbasi that Patterson made it clear to him that he needed to get his medical restrictions lifted in order to continue at his position.  (Plaintiff's Statement, ¶¶ 42 & 50.)  Dr. Gerbasi completed a Disability Certificate that stated Plaintiff had sufficiently recovered to resume a normal workload and that he could return to work as of August 7, 2003, without restrictions.  (Defendant's Statement, ¶¶ 25 & 28.)  Plaintiff submitted the certificate to the United States Postal Service on August 14, 2003.  (Defendant's Statement, ¶ 30.)  Plaintiff did not submit any additional medical documentation regarding his ability to work with or without limitations between August 7, 2003 and January 5, 2004. (Defendant's Statement, ¶ 35.)

After submitting the new medical documentation, Plaintiff continued to work full time, without incident and without any performance issues raised by Patterson.  (Plaintiff's Statement, ¶ 55.)  Plaintiff sought and obtained permission from Patterson excusing him from a national meeting in Florida.  (Plaintiff's Statement, ¶ 59.)  Plaintiff told Patterson that his physician was concerned about the walking involved, the plane ride, and being away from his physician.  (Bohen Aff. ¶ 33, April 26, 2007.)

On December 1, 2003, Plaintiff saw Dr. Gerbasi.  (Defendant's Statement, ¶ 37.) Dr. Gerbasi found that the wound on Plaintiff's foot had become worse and placed him on

bed rest for 30 days.  (Defendant's Statement, ¶ 37.)  Plaintiff did not discuss Dr. Gerbasi's

bed rest directive with Patterson, and instead requested 30 days annual leave.  (Bohen

Dep. 82:16-23; 83:18-21.)  Plaintiff requested annual leave because he had excess leave

time, which would be forfeited if he did not use it by the end of the year.  (Plaintiff's

Statement, ¶ 62; Defendant's Statement, ¶ 61.)  Patterson approved the leave.  (Plaintiff's

Statement, ¶ 63.)  Dr. Gerbasi did not provide a new disability certificate that indicated

Plaintiff needed time off from work because of his medical condition.  (Defendant's

Statement, ¶ 38.)  Further, Dr. Gerbasi never indicated to Plaintiff that he could not return

to work after resting the foot for thirty days.  (Bohen Aff. ¶ 37.)

While Plaintiff was on annual leave, Patterson identified a number of deficiencies

in Plaintiff's area of responsibility.  (Defendant's Statement, ¶ 63.)  After reviewing these

deficiencies, Patterson stated that he lost confidence in Plaintiff's ability to perform his

duties effectively. (Defendant's Statement, ¶ 63.) As a result, Patterson assigned another

Manager to take over Plaintiff's position in order to correct the alleged deficiencies,

developed a Performance Improvement Plan to assist Plaintiff, and assigned Plaintiff to

a six-month detail position as Postmaster in Springville, New York. (Patterson Aff. ¶ 6,

October 19, 2004.)  Patterson stated that he intended to return Plaintiff to his position as

POOM after the deficiencies had been corrected.   (Defendant's Statement, ¶ 67.)

Although the Springville Postmaster position was several grades below the POOM position

(Plaintiff's Statement, ¶ 74), the Springville detail did not adversely affect Plaintiff's salary

or employee benefits. (Defendant's Statement, ¶ 68.)

###### 1.      January 5, 2004

On January 5, 2004, Plaintiff met with Patterson.  (Defendant's Statement, ¶ 70.)

Patterson provided Plaintiff with a performance evaluation for the 2003 fiscal year that stated Plaintiff "met objectives/expectations." (Defendant's Statement, ¶ 70.) Patterson also presented Plaintiff with the Performance Improvement Plan ("PIP") and told Plaintiff that, because of the seriousness of the deficiencies, Plaintiff was to report to Springville the next day for the six-month detail. (Defendant's Statement, ¶¶ 72 & 75.) Typically, when an employee is to be presented with a PIP, the employee is advised of the deficiencies before the PIP is presented and the employee typically participates in the development of the plan. (Plaintiff's Statement, ¶ 77.)

The meeting between Plaintiff and Patterson did not last long because Patterson was rushing to catch a flight. (Plaintiff's Statement, ¶¶ 79 & 80.) At the meeting, Plaintiff told Patterson that the assignment threatened his health. (Plaintiff's Statement, ¶ 86.) Plaintiff also wrote Patterson a memo wherein he requested a reasonable accommodation from the Springville assignment. (Plaintiff's Statement, ¶ 87.) Plaintiff's memo set forth his chronic diseases and physical condition. Id. However, Plaintiff did not specify the nature of accommodation he was seeking. (Defendant's Statement, ¶¶ 81-83.)

In response, Patterson informed Plaintiff that the most recent document he had on file indicated that Plaintiff's physical health permitted him to resume his job without restrictions. (Defendant's Statement, ¶ 88.) Patterson told Plaintiff to submit medical certification indicating that the assignment was threatening to his health. (Defendant's Statement, ¶ 89.) Plaintiff indicated that he would do so. (Defendant's Statement, ¶ 94.) Patterson further directed Plaintiff to report to Springville the following morning, and inform Sylvia Morris, Manager of Human Resources for the Western District, about any problems he might have with the assignment. (Defendant's Statement, ¶ 95.)

Because Patterson was leaving town, he delegated full authority to Sylvia Morris. (Plaintiff's Statement, ¶ 95.)  Patterson instructed Morris that if there were any problems, she could make alternate work arrangements for Plaintiff until his doctor's appointment or reassign Plaintiff to the Blasdell Station, as Station Manager.  (Plaintiff's Statement, ¶¶ 96-97.)  The Blasdell Station Manager does not perform as much physical work as the Postmaster in Springville.  (Plaintiff's Statement, ¶ 100; Defendant's Statement, ¶ 105.) Patterson also told Morris that, should Plaintiff voice concerns, she could address those concerns with the District's Reasonable Accommodation Committee.   (Defendant's Statement, ¶ 90.)

### 2.    January 6, 2004

Plaintiff reported to the Springville Post Office at approximately 7:30 a.m. (Defendant's Statement, ¶ 106.)   When Plaintiff arrived, he discussed the duties of Postmaster at the Springville Post Office with then-Postmaster, Irene Barone.  (Plaintiff's Statement, ¶ 104.)  Barone informed Plaintiff that she worked ten hours a day, and spent at least four hours delivering mail, servicing vending machines, transporting mail, and spent the remainder of the day on her feet.  (Defendant's Statement, ¶ 108.)  Plaintiff informed Barone that the job was too physically demanding for him.  (Defendant's Statement, ¶ 109.) Barone agreed and stated that the job was even too physically demanding for her on some days.  (Defendant's Statement, ¶ 110.)  After spending approximately one and a half hours at the Springville location, Plaintiff went home.  (Defendant's Statement, ¶ 112.)

Upon his return home, Plaintiff called Morris to convey his concerns about the assignment.  (Defendant's Statement, ¶ 114.)  Morris was unavailable and Plaintiff left a message.  (Defendant's Statement, ¶ 115.)  Plaintiff told his wife that, if Morris called back,

she should advise Morris that all communications going forward needed to be in writing. (Plaintiff's Statement, ¶ 108.)  When Morris called back, Plaintiff's wife conveyed the message.  (Defendant's Statement, ¶ 117.)  Morris never spoke with Plaintiff on January 6, 2004, or thereafter.  (Defendant's Statement, ¶ 118.)

By letter dated January 6, 2004, Plaintiff wrote Morris advising her that he was unable to perform the Springville detail assignment given his physical limitations. (Defendant's Statement, ¶ 122.)  Morris was concerned about not knowing Plaintiff's specific injuries because the last medical documentation on record indicated that Plaintiff had been released to full time duty without restrictions.  (Morris Dep. 104:8-17.)  Morris believed that nothing short of medical certification would have changed her opinion about whether Plaintiff qualified as a disabled person.  (Morris Tr. 108:2-5.)  Plaintiff submitted no medical documentation to the United States Postal Service to support his claim that he had severe walking and standing restrictions as of January 6, 2004.  (Defendant's Statement, ¶ 127.)  On January 6, 2004, Plaintiff requested paperwork for a disability retirement (Defendant's Statement, ¶ 120), and, during Plaintiff's deposition, Plaintiff stated that there was no accommodation that the Postal Service could give him that would allow him to do the job in Springville.  (Defendant's Statement, ¶ 126.)

### 3.    *January 7, 2004*

Plaintiff did not report to work on January 7, 2004.  (Defendant's Statement, ¶ 128.) At the end of his scheduled shift, Plaintiff contacted the Attendance Control Officer at the United States Postal Service and advised that he would be absent indefinitely due to stress.  (Defendant's Statement, ¶ 130.)  Plaintiff did not personally notify Patterson of his absence.  (Defendant's Statement, ¶ 131.)  As a result, Plaintiff was charged with Absent

Without Official Leave ("AWOL").  (Letter from David Patterson to Timothy Bohen, March 9, 2004, Docket No. 15, Ex. JJ.)  Patterson also stated in his letter to Plaintiff that, "[t]he last medical record that you have on file indicates that you are able to perform your full duties with no medical restrictions."  (Letter from David Patterson, Ex. JJ.)

Morris sent Plaintiff three letters, all dated January 7, 2004.  (Plaintiff's Statement, ¶ 117.)  None of the letters mentioned the Blasdell position.  (Plaintiff's Statement, ¶ 117.)  Morris informed Plaintiff that Patterson instructed him to submit medical certification to support any medical limitations.  (Letter from Sylvia Morris to Timothy Bohen, January 14, 2004, Docket No. 19, Ex. 14.)  Plaintiff never submitted any medical documentation to the United States Postal Service to support his request for a reasonable accommodation.  (Defendant's Statement, ¶ 124.)

### 4.   Additional Events

Plaintiff visited Russell Shefrin, Ph.D., his psychologist on January 8, 2004.  (Plaintiff's Statement, ¶ 131.)  By letter dated January 21, 2004, addressed to Morris, Dr. Shefrin stated that Plaintiff was unable to work because of "intense emotional distress" that commenced on January 6, 2004.  (Defendant's Statement, ¶ 134.)  Dr. Shefrin wrote additional letters on January 12, January 30, and February 19, 2004, indicating that Plaintiff was psychologically unable to work until May 3, 2004.  (Defendant's Statement, ¶¶ 135 & 139.)

On January 10, 2004, Plaintiff applied for injury compensation benefits.  (Defendant's Statement, ¶ 136.)  Plaintiff indicated that the disease or illness for which he sought compensation benefits was stress, anxiety, and depression, all of which were caused or aggravated by his employment.  (Plaintiff's Statement, ¶ 133; Bohen Tr. 123:5-

14).  Plaintiff stated that the "extreme stress began on January 5, 2004 when Mr. Patterson arbitrarily and capriciously assigned me to [Springville]."  (Docket No. 15, Ex. AA).  Plaintiff was eventually awarded $187,000.28 in gross workers compensation benefits.  (Docket No. 22, Ex. A.)

On January 15, 2004, Plaintiff applied for disability retirement benefits.  (Defendant's Statement, ¶ 143.)  On his application, Plaintiff indicated that he became disabled as of January 1, 2003.  (Defendant's Statement, ¶ 144.)  Plaintiff stated that his disability was the result of the amputation of his left foot, his "collapsed right foot" and the ulcer that will not heal.  (Docket No. 15, Ex. PP.)  Plaintiff's application for disability benefits was approved on April 7, 2004 and became effective on June 2, 2004.  (Bohen Aff. ¶ 1, June 24, 2004.)

On January 22, 2004, Plaintiff visited Dr. Gerbasi and brought him a letter stating that "due to other health problems, as well as my left foot amputation and right charcot joint, I can no longer provide my job duties."  (Defendant's Statement, ¶ 43.)  After Dr. Gerbasi examined Plaintiff, he felt that Plaintiff had not responded to bed rest, and agreed that Plaintiff could no longer perform the duties required of him in his current position. (Defendant's Statement, ¶ 44.)  On January 29, 2004, Plaintiff was examined by Bernard Rohrbacher, M.D., an orthopedic surgeon, who believed that Plaintiff was a candidate for total disability because of the physical condition of his feet.  (Defendant's Statement, ¶ 45; Docket No. 15, Ex. O.)

On February 25, 2004, Morris wrote Plaintiff informing him that he had still not submitted any medical documentation supporting his request for a reasonable accommodation. (Defendant's Statement, ¶ 141.)  However, on March 9, 2004, Deborah

11

Miller, M.D., a USPS contract physician, reviewed the medical documentation in Plaintiff's disability retirement file and concluded that he was totally disabled from his position as both POOM and Postmaster. (Defendant's Statement, ¶ 47.) Further, by letter dated March 10, 2004, Dr. Gerbasi informed the Postal Service that Plaintiff could no longer perform the duties required of him in his present position. (Defendant's Statement, ¶ 46.) Dr. Gerbasi's letter did not indicate any prior date that, in his opinion, Plaintiff was unable to perform the duties required of him in his current position. (Gerbasi Letter, March 10, 2004, Docket No. 15, Ex. G.)

But during his deposition, Dr. Gerbasi testified that Plaintiff was no longer able to perform his duties as Manager of Post Office Operations as of December 1, 2003. (Gerbasi Dep. 55:10-56:1.) The following exchange took place at Dr. Gerbasi's deposition:

> Q: Between August 7, 2003 and January 22, 2004, did you anywhere in your record indicate that it was your opinion that Mr. Bohen cannot perform the duties required of him in current position, his duties at the Post Office
>
> A: On 12/1/03, when he came to the office and should be off for 30 days, I certainly felt that was necessary. I didn't realize at the time that he was going to use vacation days to do that, I just assumed that he wasn't going to work and could no longer do his duties. So, I think as of that date, from my point of view, so that would be the day I would first say, 12/1/03.
>
> Q: So, as of 12/1/03, was it your opinion that Mr. Bohen was no longer able to perform his duties as a Manager of Post Office Operations?
>
> A: I believe so with the information I have.

(Gerbasi Dep. 55:10-56:1.)

## B.   Procedural History

Plaintiff commenced this action by filing a Complaint in the United States District Court for the Western District of New York on December 30, 2004. (Pl. Compl., Docket

No. 1).   Plaintiff alleged that his former employer, the United States Postal Service, discriminated against him on the basis of his disability, race, sex, and age.  (Pl. Compl.) The matter was assigned to the Honorable John T. Elfvin, Senior United States District Judge.

On October 16, 2006, Defendant filed a Motion for Summary Judgment.  (Docket No. 12).  Plaintiff does not oppose summary judgment on his discrimination claims based on race, color, sex or age.  (Docket No. 17, Def. Mem. Supp. Summ. J. 3.)  Accordingly, summary judgment will be granted on those claims.  However, Plaintiff opposes the motion as to his claims of discrimination on the basis of his disability, failure to accommodate his disability, and constructive discharge.  On October 17, 2007, this case was reassigned to this Court after Judge Elfvin elected to take inactive status.


## III.  DISCUSSION AND ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).  A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." Id.

## B.    Defendant's Motion for Summary Judgment

Defendant contends that he is entitled to summary judgment because: (1) Plaintiff has not established a prima facie case of discrimination under the Rehabilitation Act; (2)

14

Plaintiff has not established a prima facie case of Defendant's failure to accommodate under the Rehabilitation Act; and (3) Plaintiff was not constructively discharged.  As stated, Plaintiff opposes summary judgment on these grounds.

**1.      Discrimination on the Basis of Disability Under the Rehabilitation Act**

        **a.      Establishing a Prima Facie Case**

The Rehabilitation Act prohibits federal agencies from discriminating against otherwise qualified individuals with disabilities in the employment context.  <u>See</u> 29 U.S.C. § 794(a).[6]  To establish a *prima facie* case of discriminatory termination in violation of the Rehabilitation Act, a plaintiff must show that: (1) he is a handicapped person under the Act; (2) he is otherwise qualified to perform the job; (3) he was discharged because of his handicap; and (4) the employer is a recipient of federal financial assistance.  <u>Heilweil v. Mount Sinai Hosp.</u>, 32 F.3d 718, 722 (2d Cir. 1994).  "If proof of any of the four elements is lacking, the claim must fail." <u>Sedor v. Frank</u>, 42 F.3d 741, 746 (2d Cir. 1994).

For the present motion, the parties disagree only about whether Plaintiff satisfies prong two – in other words, whether Plaintiff was "otherwise qualified."

        **b.      Otherwise Qualified**

The Second Circuit defines what constitutes "otherwise qualified" and discusses which party bears the burden of proof:

> The plaintiff bears the burden of production and persuasion on the issue of whether he is otherwise qualified for the job in question.  A plaintiff cannot be

---

[6]The Rehabilitation Act applies the same standards as the Americans with Disabilities Act ("ADA"), and the case law interpreting the ADA is applicable to the Rehabilitation Act. <u>Francis v. City of Meriden</u>, 129 F.3d 281 (2d Cir. 1997).

considered otherwise qualified unless he is able, with or without assistance, to perform the essential functions of the job in question.  It follows that the plaintiff bears the burden of proving either that she can meet the requirements of the job without assistance, or that an accommodation exists that permits her to perform the job's essential functions.

Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 137-8 (2d Cir. 1995).

Whether an individual is qualified is dependent upon his condition at the time of the alleged adverse employment action.  Mazza v. Bratton, 108 F.Supp.2d 167, 176 (E.D.N.Y. 2000), *aff'd* 9 Fed. Appx. 36 (2d Cir. 2001).   An individual that is incapable of regular attendance is not otherwise qualified.  Daddazio v. Katherine Gibbs Sch., Inc., No. 98-CV-6861, 1999 WL 228344, at *5 (S.D.N.Y. 1999), *aff'd mem.*, 205 F.3d 1322 (2d Cir. 2000). An individual that is totally disabled, and thus incapable of performing the essential functions of his job, with or without accommodations, is not "otherwise qualified." See, e.g., Scott v. Mem'l Sloan-Kettering Cancer Ctr., 190 F.Supp.2d 590, 597 (S.D.N.Y. 2002) (dismissing ADA claim on summary judgment where employee admitted that her disability rendered it "impossible" for her to perform her job at the time at which she was terminated); Muller v. First Unum Life Ins. Co., 90 F.Supp.2d 204, 208 (N.D.N.Y. 2000) ("[W]here an individual claims that he/she is totally disabled and unable to perform any of the essential functions of his/her job, he/she is not a [qualified individual with a disability] under the ADA."); Clark v. New York State Elec. & Gas Corp., 67 F. Supp. 2d 63, 74 (N.D.N.Y. 1999) (quoting Belgrave v. City of New York, 95-CV-1507, 1999 WL 692034, at *148 (E.D.N.Y. Aug. 31, 1999) ("The discharge of an individual who is totally disabled and thus, unable to perform any job, no matter what its essential function, cannot be discriminatory 'even where the individual is fired because of the disability.'")); Bril v. Dean Witter, Discover & Co., 986 F.Supp. 171, 175 (S.D.N.Y. 1997) (holding that plaintiff "who admittedly was

16

totally disabled at the time her benefits were discontinued" was not a qualified person with a disability, and therefore, could not sue her employer under the ADA); Violette v. Int'l Bus. Machines Corp., 962 F.Supp. 446, 449 (D.Vt. 1996), aff'd, 116 F.3d 446 (2d Cir. 1997) ("Because Plaintiff cannot perform the essential functions of the job he held, he is not entitled to the relief provided for 'qualified individuals' under the ADA"); Parker v. Columbia Pictures Industries, 204 F.3d 326, 335 (2d Cir. 2000) (reversing grant of summary judgment after circuit court determined there was a disputed issue of fact as to whether plaintiff was capable of performing his job with reasonable accommodation at the time that he was terminated)

The receipt of Worker's Compensation Benefits and Social Security Disability Benefits "does not automatically bar a claim under the ADA." Ramos-Boyce v. Fordham University, 419 F.Supp.2d 469, 473 (S.D.N.Y. 2005) (citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)).  However, "an ADA plaintiff who is receiving disability benefits must proffer a 'sufficient explanation' for why she asserted total disability in the agency proceeding while maintaining that she was a 'qualified individual with a disability' in the ADA action."  Id. (quoting Cleveland, 526 U.S. at 806, 119 S.Ct. 1597).  "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." Nodelman v. Gruner & Jahr USA Pub., No. 98-CV-1231, 2000 WL 502858, at *8 (S.D.N.Y. April 26, 2000) (internal citations omitted).

17

### c.    Arguments of the Parties

Defendant argues that Plaintiff was not otherwise qualified because he was totally disabled as of December 1, 2003, and incapable of performing his position as POOM more than one month prior to the actions Plaintiff claims constitute adverse employment action.[7] Defendant cites to various portions of the record in support of its claim.  First, Defendant points to Dr. Gerbasi's statement during his deposition that Plaintiff was totally disabled as of December 1, 2003.  Second, Defendant argues that the medical opinions of Drs. Miller, Rohrbacher, and Gerbasi, who all concluded that Plaintiff was disabled as of March 2004, support his position that Plaintiff was unable to work, with or without accommodations, after December 1, 2003.   Third, Defendants point to Plaintiff's statement on his disability application that he was totally disabled as of January 1, 2003, almost one year before the date in question.   Fourth, Defendants argue that Plaintiff's failure to ask his health care providers for a statement regarding his ability to perform the duties of Postmaster and his failure to submit any medical certification in support of his request for an accommodation, create an inference that nobody would provide such documentation because he was totally disabled.  Lastly, Defendant contends that Plaintiff is incapable of regular attendance.

Alternatively, Defendant argues that Plaintiff was not otherwise qualified as of January 6, 2004.  Defendant argues that Plaintiff's treating psychologist, Russell Shefrin, Ph.D., by letter dated January 21, 2004, determined that Plaintiff was unable to work due to intense emotional distress beginning on January 6, 2004.

---

[7]Plaintiff alleges the adverse employment action occurred on January 5, 2004, the day "David Patterson abruptly and without justification drastically changed Tim Bohen's job assignment and unreasonably denied him an accommodation."  (Docket No. 17, Pl. Memo Opp. Summ. J. 13.)

In response, Plaintiff argues that, despite Plaintiff's protestations towards the Springville assignment at the time, Morris and Patterson stated that they were unaware of Plaintiff's alleged disability.  Plaintiff therefore argues that Defendant is attempting to justify its actions by retroactively applying facts that were unknown to Defendant at the time of its adverse action.  Plaintiff also argues that there are "inconsistencies" between Dr. Gerbasi's deposition statement and Defendant's actions at the time along with Plaintiff's understanding of Dr. Gerbasi's statements.   Plaintiff also points to his satisfaction of employment duties over the past thirty-five years of employment, including the past ten in his current position, as evidence that he is otherwise qualified.  And lastly, Plaintiff attempts to reconcile his disability application with his current claim, arguing that his application statement is taken out of context.  According to Plaintiff, his statement that he was totally disabled as of January 1, 2003, relates to the more physically demanding Springville Postmaster assignment and has no bearing on his ability to perform his POOM functions.

In response to Defendant's alternative argument, Plaintiff maintains that the actions by Defendant on January 5, 2004, caused Plaintiff's injury on January 6, 2004.  Therefore, Plaintiff contends that the actions of January 5, 2004, cannot be justified by claiming that Plaintiff was totally disabled as of January 6, 2004.

### d.    *A Genuine Issue of Material Fact Exists Preventing Summary Judgment*

### i.    *Plaintiff's Disability as of December 1, 2003*

Defendant's motion is denied because the record reveals a genuine factual dispute as to when Plaintiff became totally disabled.   As a result, this Court cannot determine whether Plaintiff was capable of performing the essential functions of his position, with or

without reasonable accommodations, before January 5, 2004 – the date of the alleged adverse employment action.  Accordingly, summary judgment is unwarranted.

In terms of establishing the date that Plaintiff became totally disabled, the record is far from clear.  This uncertainty results from the variations, and inconsistencies, that Plaintiff allegedly became totally disabled.  For example, Plaintiff's disability application states that he was totally disabled as of January 1, 2003.  Despite this statement, Plaintiff informed Dr. Gerbasi, on August 7, 2003, that he was able to return to work on a full time basis.  On the same day, Dr. Gerbasi examined Plaintiff and medically cleared him to return to work without restrictions.  Although Plaintiff did not work at all during the month of December 2003, as of January 5, 2004, he was "ready, willing, and able to work" by his own admission.  (Plaintiff's Statement, ¶ 70.)  However, not even one full month later, on January 22, 2004, Plaintiff saw Dr. Gerbasi and alleged that he was totally disabled.

Notwithstanding the variance in Plaintiff's own statements regarding his physical condition, this Court also finds inconsistencies between Dr. Gerbasi's belief that Plaintiff was totally disabled as of December 1, 2003, and his actions at the time.  For example, on December 1, 2003, Dr. Gerbasi directed Plaintiff to take "30-days bed rest."  Additionally, Dr. Gerbasi neither altered Plaintiff's previous work authorization, which imposed no restrictions, nor did he instruct Plaintiff to not return to work.  As of December 1, 2003, Plaintiff remained medically cleared to work full time, without restrictions, until Dr. Gerbasi's letter, dated March 10, 2004 wherein he declared that Plaintiff was incapable of performing his duties as POOM.  However, in this letter, Dr. Gerbasi did not indicate that he previously made such a diagnosis.  Dr. Gerbasi's statement in his deposition was the first time, and the only time, that he stated December 1, 2003 was the date Plaintiff could not execute his

20

duties as POOM.

Given the inconsistencies that exist on the record, this Court finds that triable issues of fact exist, such that summary judgment is precluded.   It will be the jury's task to determine whether Plaintiff was totally disabled on January 5, 2004 or otherwise qualified to perform his duties as POOM.

### e.   Defendant's Additional Arguments

Defendant's additional arguments in support of its claim that Plaintiff was totally disabled from his position as POOM prior to January 5, 2004, the date of the alleged adverse employment action, are also without merit.  First, Defendant argues that this Court should make inferential findings in its favor.  Specifically, Defendant asks this Court to infer that Plaintiff was totally disabled as of December 1, 2003, based upon the conclusions of Drs. Miller, Rohrbacher, and Gerbasi, who all found Plaintiff totally disabled as of March 2004.  And Defendant further asks this Court to infer that Plaintiff was totally disabled as of December 1, 2003, based upon his failure to submit any medical information in support of his request for a reasonable accommodation.   At this stage, however, inferences are drawn in Plaintiff's, not Defendant's, favor.  See Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 1609, 26 L.Ed.2d 142 (1970).  Accordingly, these arguments are without merit.

Next, contrary to Defendant's assertion, this Court finds that Plaintiff has proffered a sufficient explanation for why he asserted total disability as of January 1, 2003 in his disability application, while maintaining that he was a qualified individual with a disability in the present action.  Plaintiff explains that the disability application, which he completed on January 15, 2004, refers solely to his ability to perform the more physically demanding

21

duties as the Springville Postmaster, and has no bearing on his ability to perform his duties as POOM.  And in the context of the Springville Postmaster assignment, January 1, 2003 was the first date that Plaintiff believed he would have been incapable of performing the duties of Springville Postmaster.  There is enough evidence in the record to support Plaintiff's explanation.  First, Plaintiff actually returned to his POOM position in June 2003. Therefore, it would make little sense for Plaintiff to state on an application, a copy of which is given to his Supervisor, that he was physically unable to perform his job as POOM, when approximately five months after January 1, 2003, he returned to his position as POOM. Second, upon meeting with Plaintiff on January 5, 2004, Patterson provided Plaintiff with his 2003 performance evaluation that stated Plaintiff "met objectives/expectations." (Bohen Aff., ¶ 42.)  If Plaintiff was totally disabled from his position as POOM on January 1, 2003, it would be highly unlikely that Patterson would state that Plaintiff "met objectives/expectations" for the 2003 fiscal year.  Accordingly, Defendant's argument on this issue is also without merit.

Finally, this Court finds no evidence supporting Defendant's assertion that Plaintiff was incapable of regular attendance.  Before January 6, 2004, every time that Plaintiff was absent from work, he was on approved leave.

### ii.    Plaintiff's Disability as of January 6, 2004

Defendant's alternative argument is also denied.  Because Plaintiff contends that the actions of Defendant on January 5, 2004, directly caused his injury – intense emotional distress – that began on January 6, 2004, Defendant cannot immunize itself from suit by claiming that Plaintiff was not otherwise qualified to perform his duties as POOM as of January 6, 2004.  See Spence v. Maryland Cas. Co., 803 F.Supp. 649, 666 (W.D.N.Y.

22

1992), *aff'd* 995 F.2d 1147 (2d Cir. 1993) ("[s]ince Plaintiff's disability may be a direct consequence of his allegations regarding defendant's conduct and his constructive discharge, it would be illogical and contrary to the ADEA's purpose to allow an employer's alleged illegal activity to hinder an employee from demonstrating age discrimination").

. . .

Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's disability claim under the Rehabilitation Act is denied.

### 2.    *Failure to Accommodate under the Rehabilitation Act*

#### a.    *Prima Facie Case*

In order to state a prima facie case for an employer's failure to accommodate, the plaintiff must establish that: "(1) her employer was subject to the ADA; (2) she was disabled; (3) she was otherwise qualified to perform the essential functions of the job; and (4) defendant had notice of the disability and failed to provide such reasonable accommodations." Johnson v. Maynard, No. 01-CV-7393, 2003 WL 548754, at *6 (S.D.N.Y. Feb. 25, 2003) (citing Lyons v. Legal Aid Soc'y, 68 F.3d 1512, 1515 (2d Cir. 1995)).

Because there is a genuine issue of material fact regarding the date Plaintiff became totally disabled, and thus whether Plaintiff was "otherwise qualified" before the alleged adverse employment action, summary judgment is inappropriate on the grounds that Plaintiff cannot satisfy the third prong.  However, Defendant also argues that Plaintiff cannot satisfy the fourth prong – failure to provide a reasonable accommodation.

### b.      Failure to Accommodate

Federal regulations contemplate an "informal interactive process" involving the employer and the employee, who both work together to identify a reasonable accommodation for the employee.  29 C.F.R. § 1630.2(o)(3).  The "informal" interactive process "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."  Picinich v. United Parcel Service, 321 F. Supp. 2d 485, 511 (N.D.N.Y. 2004) (quoting 29 C.F.R. § 1630.2(o)(3)).

Generally, "the initial burden of requesting an accommodation is on the employee and it is only after such a request has been made that the employer must engage in the interactive process of finding a suitable accommodation."  Felix v. New York City Transit Authority, 154 F. Supp. 2d 640, 656-57 (S.D.N.Y. 2001).  However, the employee has no duty to notify his employer when "the disability is obvious or otherwise known to the employer without notice from the employee."  Simmons v. New York City Transit Authority, No. 02-CV-1575, 2008 WL 2788755, *5 (E.D.N.Y. July 17, 2008) (citing Felix, 154 F. Supp. 2d at 657).  Similarly, the Manager's Guide to Reasonable Accommodation, published by the United States Postal Service states, "[w]hen an applicant's or an employee's impairment is obvious, you cannot request medical documentation to confirm the existence of the impairment."  (Docket No. 19, Ex. 7.)

Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in [the interactive] process."  Thompson v. City of New York, No. 03-CV-4182, 2006 WL 2457694, *4 (S.D.N.Y. Aug. 10, 2006) (citing Beck v. University of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)).  "An employer

24

impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005) (quoting Taylor v. Phoenixville Sch. Dist., 174 F.3d 142, 165 (3d Cir. 1999)).

Both the interpretive regulations and courts have discussed what constitutes bad faith. For example, a party acts in bad faith when it fails "to make reasonable efforts to help the other party determine what specific accommodations are necessary." Beck, 75 F.3d at 1135. Further, "[a] party that fails to communicate, by way of initiation or response may [] be acting in bad faith." Id. Although the failure to communicate constitutes bad faith, this failure may result from "missing information." Id.

Lastly, although the plaintiff bears the burden of identifying the existence of an accommodation in a suit based upon the failure to accommodate by transfer to a vacant position, the plaintiff does not have to specifically identify the vacancy at the time plaintiff makes the request. See Jackan v. New York State Dept. of Labor, 205 F.3d 562, 568 n.4 (2d Cir. 2000) ("[Plaintiff] suggests that placing the burden on the plaintiff to prove the existence of a vacancy is unfair, given the employer's greater access to this information. This concern is over-stated. Once the litigation has begun, the plaintiff can utilize the liberal discovery procedures of the Federal Rules of Civil Procedure, including interrogatories, depositions, and document demands, to identify vacancies that existed at the pertinent time").

25

### c.      Arguments of the Parties

Defendant argues that Plaintiff was responsible for the breakdown in the interactive process, and therefore, Plaintiff cannot make out a prima facie case for failure to accommodate.   In support, Defendant points to Plaintiff's failure to provide medical documentation in support of his reasonable accommodation request, his failure to identify a specific accommodation that would allow him to perform his duties, and his refusal to communicate with Sylvia Morris after leaving Springville.  Alternatively, Defendant argues that any request for a reasonable accommodation became moot as of January 6, 2004, when Dr. Shefrin deemed Plaintiff psychologically unable to work.

In response, Plaintiff contends that Defendant is responsible for any breakdown in the interactive process.  Plaintiff argues that Defendant failed to inform him about the Blasdell vacancy.  Plaintiff also argues that he was under no requirement to provide medical documentation in support of his request for a reasonable accommodation because his medical condition was obvious.  And in response to Defendant's alternative argument, Plaintiff argues that Defendant should not escape liability because Patterson's alleged refusal to accommodate Plaintiff directly caused his psychological inability to return to work.

In reply, Defendant contends that the request for medical documentation was reasonable in light of Plaintiff's last medical record on file, which indicated that Plaintiff could work without restrictions.

### d.      Defendant's Motion is Denied

After reviewing the undisputed facts and drawing every reasonable inference in

Plaintiff's favor, this Court cannot conclude that Plaintiff failed to engage in the interactive process.   There is enough evidence on the record for a reasonable jury to find that Defendant, not Plaintiff, was responsible for the breakdown in the process.   Because there is a genuine issue as to who is responsible for obstructing the process, summary judgment is unwarranted.

A reasonable jury could conclude that Defendant failed to respond in good faith to Plaintiff's request for a reasonable accommodation.   For example, during his meeting with Patterson on January 5, 2004, Plaintiff initiated dialogue about an accommodation, both orally and in writing.   Plaintiff discussed his physical limitations, and stated that Springville would exceed his physical abilities.   In response, Patterson denied the request subject to Plaintiff obtaining medical certification in support of his claim alleging a physical inability to perform the duties of his job.   However, instead of granting Plaintiff additional time to gather such medical documentation, Patterson ordered Plaintiff to report to Springville the following morning.   Moreover, according to Morris, Plaintiff's failure to report to Springville could have resulted in a charge of insubordination.   (Plaintiff's Statement, ¶ 92.)

A trier of fact could also conclude that Defendant's failure to advise Plaintiff about the Blasdell vacancy further demonstrated its bad faith.   Even though Plaintiff did not identify Blasdell as a possibility at the time of his reasonable accommodation request, Plaintiff, through discovery, has identified that Blasdell was available at the pertinent time. See Jackan, 205 F.3d at 568 n.4.

 Further, Defendant's contention that Plaintiff needed to submit supporting medical documentation before Defendant considered his request is rejected because a jury could reasonably find that Plaintiff's condition was obvious.   In making this determination, this

27

Court notes that, beginning in June 2003 and continuing through January 5, 2004, Plaintiff wore a blue surgical boot everyday to work, his ability to walk was described as "slow and with a noticeable gait" (Plaintiff's Statement, ¶ 48), he used handicapped parking, he entered the building through a different entrance, he elevated his foot at meetings, he obtained permission to skip a Florida business trip because of medical concerns, he had prior medical certificates documenting his physical limitations, and he was out of the office from February 28 until June 5, 2003, because of the amputation of his left foot. Accordingly, a reasonable jury could find that Plaintiff displayed obvious manifestations of an underlying disability, and therefore, a genuine issue of fact exists as to whether Plaintiff had to provide Defendant with medical certification at all.

In response to Defendant's alternative argument, this Court rejects this contention for the reasons previously mentioned.  Namely that it would be illogical to immunize Defendant from suit under the Rehabilitation Act because Plaintiff was totally disabled, allegedly a result of Defendant's actions.  Therefore, this argument is without merit.

. . .

Accordingly, Defendant's request for summary judgment based upon Plaintiff's failure to accommodate claim is denied.

### 3.    Constructive Discharge

#### a.    Establishing a Claim of Constructive Discharge

Plaintiff alleges that he was constructively discharged.  "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's

working conditions so intolerable that the employee is forced into an involuntary resignation." <u>Lopez v. S.B. Thomas, Inc.</u>, 831 F.2d 1184, 1188 (2d Cir. 1987) (quotation and citation omitted); <u>see</u> <u>also</u> <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 229 (2d Cir. 2004). Unpleasant or difficult working conditions will not amount to constructive discharge.  The employer's conduct in causing the employee's resignation must constitute "deliberate action."  <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 74 (2d Cir. 2000).

"A court may find constructive discharge where the evidence shows that the employer deliberately sought to endanger the employee's health."  <u>Katz v. Beth Israel Medical Center</u>, 2001 WL 11064, *14 (S.D.N.Y. Jan. 4, 2001) (citing <u>Spence v. Maryland Cas. Co.</u>, 995 F.2d 1147, 1156 (2d Cir. 1993)).  A finding of constructive discharged is based on the totality of the circumstances.  <u>Chertkova v. Connecticut General Life Ins. Co.</u>, 92 F.3d 81, 90 (2d Cir. 1996) (reversing district court's grant of summary judgment on constructive discharge claim and concluding that "it was error to treat the various conditions as separate and distinct rather than additive.")

### b.    Arguments of the Parties

Defendant argues that a reasonable person would not have felt that there was no alternative but retirement.  In support, Defendant argues that the working conditions were not sufficiently intolerable because Plaintiff's assignment to Springville did not negatively impact Plaintiff's pension or other employee benefits, and his duty to report to Springville the following day and Patterson's inquiries into Plaintiff's retirement date are insufficient grounds for constructive discharge.

In response, Plaintiff argues that a rational trier of fact could find that Defendant's conduct was intentional and that the work conditions were sufficiently intolerable.

### c.    Defendant's Motion is Denied

Having thoroughly reviewed the record, this Court finds that a reasonable fact finder could conclude that Defendant constructively discharged Plaintiff.  Accordingly, summary judgment is unwarranted.

First, this Court finds that a material issue of fact exists as to whether Defendant's re-assignment was a deliberate attempt to endanger Plaintiff's health, and thus compel his resignation.   As previously discussed, there are issues of material facts regarding Defendant's actual or constructive notice of Plaintiff's physical condition.  If the jury finds that Defendant had notice of Plaintiff's physical condition, yet still re-assigned Plaintiff to a position with greater physical demands, it could reasonably find that Defendant deliberately sought to endanger Plaintiff's health and force his resignation.

Further supporting a finding of deliberate action is Patterson's pattern of behavior towards Plaintiff.  For example, Patterson previously inquired into Plaintiff's retirement date, informed Plaintiff that he had no need for a part-time POOM, expressed displeasure with Plaintiff's work arrangements, told Plaintiff that he needed to alter his medical status, repeatedly told Rutkowsky to obtain such medical clearance from Plaintiff, issued Plaintiff a Performance Improvement Plan without advising him in advance and/or working with him in the development of the plan and, because he was rushed to catch a flight, hastily informed Plaintiff of his Springville re-assignment.  As a result, a jury could reasonably infer that Plaintiff's re-assignment was not a benign transfer, but one step in a series of calculated decisions aimed at removing Plaintiff.

This Court also finds that a trier of fact could reasonably conclude that resignation was the only alternative because Plaintiff's work environment was sufficiently intolerable.

In making this determination, this Court has considered the discussion between Plaintiff and Irene Barone, the acting Springville Postmaster.  Ms. Barone, who does not have any physical disabilities, informed Plaintiff that the position was even too physically strenuous for her.  Given that the assignment of Springville Postmaster was often too physically demanding for Barone, a trier of fact could find that Plaintiff's six-month detail assignment, which was effective immediately and under a cloud of an insubordination charge, was sufficiently intolerable.  Further, Plaintiff left Springville after spending only one and one half hours at the location, apparently seeing, and hearing, enough about the location to conclude that it was beyond his physical limitations.

Lastly, although Defendant characterizes each separate, individual action by Defendant as an insufficient basis for constructive discharge, Defendant improperly views the evidence in isolation.  See Chertkova, 92 F.3d at 90.  Because all of the evidence taken together, for the reasons previously mentioned, could support a finding by a reasonable fact finder that Defendant constructively discharged Plaintiff, summary judgment is unwarranted.

. . .

Accordingly, Defendant's request for summary judgment based upon Plaintiff's constructive discharge claim is denied.


## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part consistent with this Decision and Order.  Specifically, Defendant's Motion for Summary Judgment is granted on Plaintiff's claims of discrimination on the basis

of race, color, sex or age.  However, Defendant's Motion for Summary Judgment is denied on Plaintiff's claims of discrimination on the basis of disability, Defendant's failure to accommodate, and Defendant's constructive discharge.

## V.  ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 12) is GRANTED in part and DENIED in part consistent with this Decision and Order.

SO ORDERED.

Dated:   March 23, 2009
            Buffalo, New York

/s/William M. Skretny
WILLIAM M. SKRETNY
United States District Judge